**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

———————————————————
                               :
TIMOTHY HART,                   :
                               :
                Plaintiff,         :
                               :           Civil Action No. 03-5841 (JAG)
                    v.                :
                               :                   **OPINION**
HILLSIDE TOWNSHIP, et al.,     :
                               :
             Defendants.       :
———————————————————:

**GREENAWAY, JR., U.S.D.J.**

This matter comes before this Court on Defendants Hillside Township (the "Township"), Hillside Fire Department (the "Fire Department"), Karen McCoy-Oliver (the "Mayor"), and Frank W. Caswell's ("Caswell") (collectively, the "Municipal Defendants" or "Defendants") motion for summary judgment,[1] pursuant to FED. R. CIV. P. 56, and on Plaintiff Timothy Hart's ("Plaintiff" or "Hart") motions for partial summary judgment, pursuant to FED. R. CIV. P. 56. For the reasons set forth below, the Municipal Defendants' motion for summary judgment is granted, and Plaintiff's motions for partial summary judgment are denied.

---

[1] Defendant Christopher Alfano ("Alfano") has submitted a separate brief in support of the Municipal Defendants' motion for summary judgment. Therefore, this Court's decision with respect to the Municipal Defendants' motion for summary judgment is also applicable to Alfano. Hereinafter, Alfano is included in the terms "the Municipal Defendants" or "Defendants."

## BACKGROUND

          The Township is a municipal entity organized under the laws of the State of New Jersey. (Defs.' Statement of Material Facts ("SOF"), at ¶ 1.)  The Fire Department is an agency of the Township and is charged with providing Fire Services to the Township and its residents.  (SOF ¶ 2.)  Karen McCoy-Oliver has been the Mayor of the Township of Hillside since 1999.  (SOF ¶ 3.)  Caswell is a former Chief of the Fire Department.  (SOF ¶ 4.)  He retired on January 31, 2003. (Id.)  Defendant Christopher Alfano ("Alfano") commenced employment with the Township in 1992 as a mechanic in the Department of Public Works.  (SOF ¶ 5.)  Alfano's job duties at the Department of Public Works included the repair of Fire Department vehicles.  (Id.)  In February of 2003, Alfano was appointed to a firefighter position with the Fire Department.  (Id.)

          On or about November 1, 2001, the Township Clerk, Janet Vlaisavljevic, requested that the New Jersey Department of Personnel ("NJDOP") issue a Certificate of Eligibles for the position of firefighter.  (SOF ¶ 6.)  Shortly thereafter, the Township received Certification No. OL012199, which identified approximately ten eligible individuals.  (SOF ¶¶ 7-8.)  Plaintiff was listed third, and Alfano tenth, on this Certification.  (SOF ¶ 8.)  The candidates were advised to complete the Fire Department's employment application.  (SOF ¶¶ 9, 11.)  Plaintiff submitted his completed employment application in December 2001.  (SOF ¶ 12.)  Thereafter, Caswell appointed a Firefighter Selection Committee (the "Committee") consisting of Deputy Chief Joachim Behnke ("Behnke"), Deputy Chief Robert Kreszl ("Kreszl"), Deputy Chief Raymond Colandrea ("Colandrea"), Deputy Chief Dominic Naples ("Naples"), Captain Douglas Ferrigno ("Ferrigno"), and Captain Jude Delane ("Delane") to handle the firefighter selection process. (SOF ¶ 13.)  Caswell did not participate in the interview or selection process.  (SOF ¶ 14.)

2

Plaintiff was interviewed by the Committee on March 15, 2002.  (SOF ¶ 15.)  The

Committee began the interview by gathering some background information on Plaintiff's work

experience.  (SOF ¶ 37.)  Several minutes into the interview, the following exchange occurred:

> SPEAKER:    What kind of skills do you have that you might be able to
> contribute, or be able to use here as a firefighter?  (Inaudible) we're aware of your
> EMS background, but I was wondering, you know, do you have any like
> (Inaudible) construction or electrical, or any – any type of background at anything
> that might help you as a firefighter?
>
> MR. HART:    (Inaudible) I used to have a little landscaping business (Inaudible).
> And I had a (Inaudible).  But other than that, I'm a flight (Inaudible) in the Army
> National Guard.  So, I have some (Inaudible) flying and discipline.

(SOF ¶ 38; Transcript of Plaintiff's Interview attached to the Affidavit of Kathryn V. Hatfield

("Hatfield Aff."), at ¶ 8, Ex. 7 at 4.)  Thereafter, Plaintiff was asked the following questions:

> (1)    Are you still in the National Guard?
> (2)    Do you have to do [sic] certain amount of training each year?
> (3)    How much time does that involve, say annually, that you have to put in
>         with the National Guard?
> (4)    Now, how flexible are they–I'm trying to get–ascertain, you have to be
>         there certain weekends or–or is there a flexibility in scheduling, or . . .
> (5)    What does that usually entail, so much per month is it or . . .
> (6)    When is that–when is that two weeks, in the summer?
> (7)    In other words, if you work–you know, the schedule here, it's 24 hours and
>         72 off.  Could it–could you choose a weekend when you're not working
>         here possibly or . . .
> (8)    How long have you been with the National Guard?
> (9)    Have you ever been disciplined in the National Guard in any way shape or
>         form?
> (10)   How long is your tour in the National Guard? As long as you want? Or . . .
> (11)   And you're–you're into one year inactive now?
> (12)   So that's something you would continue–you would still want to be, you
>         could continue to do it one year at a time?
> (13)   Is there a possibility of doing that again?
> (14)   What would it take for you to become a pilot with them?
> (15)   You think they would offer you something like that or . . .

(SOF ¶ 38; Hatfield Aff. ¶ 8, Ex. 7 at 4-8.)

3

The Committee then discussed Plaintiff's arrests, his rejection for employment from the Union County Department of Corrections, his motor vehicle history, and his work history, among other topics. (SOF ¶¶ 39-40, 42-43, 47.) Specifically, Plaintiff admitted that he was arrested for possession of a firearm (a BB gun) when he was 17, and arrested on a disorderly persons offense at 21, as a result of a dispute with his then girlfriend. (SOF ¶¶ 39-40.) Plaintiff also acknowledged that he was rejected for employment with the Union County Department of Corrections for failing to identify his disorderly persons offense on his employment application. (SOF ¶ 42.) Regarding his motor vehicle history, he admitted that he received a ticket for careless driving in 2001, a ticket for failing to obey a directional sign in 1999, and a ticket for speeding in 1996. (SOF ¶ 43.) He also admitted that between May 2000, and December 2001, he was involved in four motor vehicle accidents. (Id.) In reviewing Plaintiff's prior employment history, the Committee asked him about his employment with the Bar "Anticipation." (SOF ¶ 45.) Plaintiff indicated that he was a bouncer and that on multiple occasions he had to break up a fight. (Id.) He described one occasion as follows:

> MR. HART:   I don't know what the **hell** it was, he bumped me, he bumped me. Got into a fight, I jumped on one of them, he lit a (Inaudible) he was throwing me around (Inaudible). It's nice, come down and meet the women and you have to work (Inaudible), $6 an hour.

(SOF ¶ 45; Hatfield Aff. ¶ 8, Ex. 7 at 33.) (emphasis added.) At the conclusion of the interview, Plaintiff apologized for not wearing a suit. (SOF ¶ 49.)

As part of the selection process, Plaintiff was evaluated by a psychologist on April 17, 2002. (SOF ¶¶ 50-51.) The psychological report indicates that Plaintiff "explained . . . that he had not earned most of the credits taken during his year at community college and concluded that he had been more interested in socializing. As a result of his immaturity and lack of focus he had

4

multiple course failures." (SOF ¶ 52; Hatfield Aff. ¶ 25, Ex. 24 at 2.) The report goes on to state that "Mr. Hart's functioning in other background areas also reflects some issues adhering to standards. He has a criminal record as both a juvenile and an adult. However, during the Clinical Interview Mr. Hart was able to discuss these incidents and accept responsibility for his actions." (Id.) In summary, the psychologist determined:

> Timothy Hart is a twenty-six year old male who appears to be adequately managing situational demands. He presents as a somewhat immature individual but one who has experience working in the public sector. The current clinical assessment does not reveal the presence of any pervasive psychological disturbances that would warrant disqualifying his candidacy for the position of Firefighter with the Hillside Fire Department.

(SOF ¶ 52; Hatfield Aff. ¶ 25, Ex. 24 at 4.)

Following review of the individual applications, personal interviews, background checks, criminal history checks, medical evaluations, drug testing, and psychological reports, the Committee submitted a memorandum to Caswell ranking the individual candidates in order of preference. (SOF ¶ 16.) Alfano was ranked third and Plaintiff sixth. (SOF ¶ 17.) On April 22, 2002, Caswell sent a memo to the Mayor forwarding the Committee's recommendations and listing the order in which the candidates should be hired, with Alfano listed third, and noting that Plaintiff, ranked sixth, was not recommended at that time, but would be kept on the list for future consideration. (SOF ¶ 18.) Caswell did not make any changes to the list of recommended candidates submitted by the Committee. (SOF ¶ 90.) Regarding the top three candidates the memo stated:

> The top three listed have progressed through all phases of the review process without impediment. These candidates have interviewed exceptionally well and in combination with their application submittals, background checks, criminal history check, medical evaluation, drug testing and psychological results proved to be the most qualified for the positions available.

(SOF ¶ 18; Hatfield Aff. ¶ 10, Ex. 9.)  In May 2002, the Township appointed the top two candidates recommended by the Committee to firefighter positions, and submitted the completed Certification No. OL012199 to the NJDOP.  (SOF ¶ 19.)  On Certification No. OL012199, the Township noted that five names should be removed from the Certificate of Eligibles due to a variety of reasons.  (SOF ¶ 20.)

On or about May 15, 2002, Caswell submitted another memo to the Mayor in which he enclosed the Committee's recommendations if Hillside were in the position to hire an additional firefighter, with Alfano ranked first and Plaintiff ranked third.  (SOF ¶ 22.)  The Township did not hire any additional firefighters in 2002.  (SOF ¶ 23.)

In early 2003, the Township determined to hire another firefighter, and requested that the NJDOP issue a Certificate of Eligibles for the position.  (SOF ¶ 24.)  The NJDOP issued Certification No. OL030276, which identified ten eligible individuals, with Plaintiff listed first and Alfano sixth.  (SOF ¶ 25.)  Despite the Township's earlier request to have certain names removed, those names remained on the Certification.  (SOF ¶ 26.)  Specifically, the Township had requested that three names between Plaintiff and Alfano be removed.  (Id.)  Because the Township believed that those names were inadvertently included and should be removed from the Certification, Behnke submitted a letter with supporting documentation to the NJDOP in support of the Township's request that those individual's names be removed from the Certification.[2]  (Id.)  Thereafter, Behnke submitted a memo to the Mayor with the recommendations of the Committee which ranked the top three remaining eligible candidates

---

[2]Deputy Chief Behnke became Acting Fire Chief upon Caswell's retirement.  (SOF ¶ 26 n.1.)

from the Certification in the following order: 1. Alfano, 2. Jeffrey Barron, and 3. Plaintiff.  (SOF ¶ 27.)  Subsequently, Alfano was provisionally appointed to the position of firefighter effective February 24, 2003.  (SOF ¶ 29.)

On September 11, 2003, Plaintiff filed an appeal of his bypass for the firefighter position with the NJDOP.  (SOF ¶ 31.)  He asserted that he was bypassed because of his membership in the National Guard.  (Id.)  On March 12, 2004, the NJDOP issued a Final Administrative Action of the Merit System Board on Plaintiff's bypass appeal.  (SOF ¶ 32.)  In its decision, the Commissioner of the NJDOP determined that Plaintiff's assertions of discrimination were unsupported by the record and that he had not established, by a preponderance of the evidence, a prima facie case of discrimination based on his National Guard service.  (Id.)  Plaintiff's bypass appeal was denied.  (Id.)

On December 5, 2003, prior to the NJDOP's decision, Plaintiff filed a four-count Complaint in this Court against the Municipal Defendants, alleging that he was bypassed for a Township firefighter position because of his membership in the New Jersey National Guard. (SOF ¶ 33.)  Plaintiff's Complaint alleges that Defendants violated the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4311 et seq., and the New Jersey Law Against Discrimination ("LAD"), N.J. Stat. Ann. 10:5-1 et seq.  (Id.)  Plaintiff also asserted a claim under the Open Public Records Act ("OPRA"), N.J. Stat. Ann. 47:1A:1 et seq., and a claim for slander.[3]  (Id.)  Plaintiff seeks to be appointed to a firefighter position and to have Alfano removed from the position.  (Id.)

The parties appeared before this Court on February 23, 2006, for oral argument.

---

[3]On February 27, 2006, the parties stipulated to the dismissal, with prejudice, of Plaintiff's OPRA and slander claims.

# APPLICABLE LAW

## A.     Standard of Review

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit.  See Anderson, 477 U.S. at 248.  The moving party must show that, if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof.  See Celotex v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings.  See Sound Ship Bldg. Co. v. Bethlehem Steel Co., 533 F.2d 96, 99 (3d Cir. 1976), cert. denied, 429 U.S. 860 (1976).  At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  See Anderson, 477 U.S. at 249.  In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party.  See Wahl v. Rexnord Inc., 624 F.2d 1169, 1181 (3d Cir. 1980).

**B.     Uniformed Services Employment and Reemployment Rights Act ("USERRA")**

Section 4311(a) of Title 38, United States Code, provides in relevant part, that any member of the uniformed services "shall not be denied initial employment . . . by an employer on the basis of that membership . . . performance of service, application for service, or obligation." An employer is considered to have engaged in prohibited discrimination under this section if the individual's membership or service in the uniformed services "is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service."  38 U.S.C. § 4311(c)(1).

An employee making a USERRA discrimination claim bears "the initial burden of showing by a preponderance of the evidence that the employee's military service was 'a substantial or motivating factor' in the adverse employment action." Sheehan v. Department of the Navy, 240 F.3d 1009, 1013 (Fed. Cir. 2001) (quoting National Labor Relations Bd. v. Transportation Management Corp., 462 U.S. 393, 400-01 (1983) abrogated by Director, Office of Workers' Compensation v. Greenwich Collieries, 512 U.S. 267 (1994) (on other grounds).  "If this requirement is met, the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason." Id.  "The factual question of discriminatory motivation or intent may be proven by either direct or circumstantial evidence." Id. at 1014.  Under USERRA, discriminatory motive may be reasonably inferred from a variety of circumstantial factors (as discrimination is rarely open or notorious), including:

> proximity in time between the employee's military activity and the adverse
> employment action, inconsistencies between the proffered reason and other

9

> actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.

Id. In order to determine whether "the employee has proven that his protected status was part of the motivation for the agency's conduct, all record evidence may be considered, including the agency's explanation for the actions taken. Id.

Once the employee has met this burden, "the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action." Id. Unlike the McDonnell Douglas framework applied in other discrimination cases, the procedural framework and evidentiary burdens set out in § 4311 shifts the burden of persuasion to the employer. See id. Therefore, "in USERRA actions there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the agency action, upon which the agency must prove, by a preponderance of the evidence, that the action would have been taken despite the protected status." Id.

## C.    New Jersey Law Against Discrimination ("LAD")

The LAD prohibits employers from discriminating in employment on numerous bases, including "the liability for service in the Armed Forces of the United States." N.J. STAT. ANN. 10:5-12(a) (2006). An analysis of an employment discrimination claim brought under the LAD follows the burden shifting method of proof established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Erickson v. Marsh & McLennan Co., 117 N.J. 539, 550 (1990); Peper v. Princeton University Board of Trustees, 77 N.J. 55, 82 (1978). The McDonnell Douglas standard is comprised of a three-stage process. 411 U.S. at 802-05. The first stage of the analysis requires the plaintiff to prove, by a preponderance of the evidence, the four elements of a

prima facie case of discrimination.  McDonnell Douglas, 411 U.S. at 802.  A prima facie cause of

action under the LAD is established when the plaintiff demonstrates by a preponderance of the

evidence that he or she:

> (1)   belongs to a protected class,
> (2)   applied and was qualified for a position for which the employer was
>         seeking applicants,
> (3)   was rejected despite adequate qualifications, and
> (4)   after rejection the position remained open and the employer continued to
>         seek applications for persons of plaintiff's qualifications.

Erickson v. Marsh & McLennan Co., 117 N.J. 539, 550 (1990) (quoting Andersen v. Exxon Co.,

89 N.J. 483, 492 (1982)).  The components of the prima facie case, particularly the fourth

element, may be adjusted in light of the particular plaintiff's claim.  Williams v. Pemberton Tp.

Public Schools, 733 A.2d 571, 578 (N.J. Super. Ct. App. Div. 1999).

Establishment of a prima facie case gives rise to a rebuttable presumption that the

employer unlawfully discriminated against the employee.  In order to rebut the presumption, the

employer, in the second stage of the process, must present admissible evidence of a legitimate,

non-discriminatory reason for its rejection of the employee.  McDonnell Douglas, 411 U.S. at

802; see also Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).  Where

the employer produces such evidence, the presumption of discrimination disappears.  St. Mary's

Honor Ctr. v. Hicks, 509 U.S. 502, 507-08 (1993).

In the third and final stage of the process, the burden of production then shifts back to the

employee, who has "the opportunity to prove by a preponderance of the evidence that the

legitimate nondiscriminatory reason articulated by the defendant was not the true reason for the

employment decision but was merely a pretext for discrimination."  Andersen, 89 N.J. at 493

11

(citation omitted).  An employee may meet this burden either by persuading the court "directly 'that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"  <u>Murray v. Newark Hous. Auth.</u>, 311 N.J. Super. 163, 173 (Law Div. 1998) (quoting <u>Burdine</u>, 450 U.S. at 256).

Courts have held that "to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)."  <u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994) (internal citations and emphasis omitted).  To prevail, a plaintiff must show more than that the employer's decision was wrong or mistaken because the issue is whether the employer acted with discriminatory animus.  <u>Abramson v. William Paterson College of N.J.</u>, 260 F.3d 265, 283 (3d Cir. 2001).  Thus, a plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's reasons that "a reasonable factfinder *could* rationally find them 'unworthy of credence.'"  <u>Fuentes</u>, 32 F.3d at 765 (citation omitted).  Although the burden of production shifts throughout the process, the employee at all times retains the ultimate burden of persuasion that the adverse employment action was caused by purposeful or intentional discrimination.  <u>Burdine</u>, 450 U.S. at 256.

## DISCUSSION

Defendants assert that they are entitled to summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, because no genuine issue as to a material fact exists as to whether they would have hired Alfano over Plaintiff even without the alleged improper

consideration of Plaintiff's military service.[4]        Upon review of the parties' submissions, and having heard oral argument, this Court agrees.  The Municipal Defendants' motion for summary judgment is granted.  Plaintiff's motions for partial summary judgment are denied.[5]

## A.    Plaintiff's USERRA Claim

Defendants argue that Plaintiff has cited no evidence from which a jury reasonably could find that his military service was a substantial or motivating factor in the Township's employment decisions.  Defendants further argue that contrary to Plaintiff's assertions, Plaintiff's evidence: (1) the discussion at his interview concerning his military service;[6] and (2) his opinion that he was a better candidate, does not support his position.  First, Defendants assert and Plaintiff has conceded, that it was Plaintiff who initially raised his National Guard service as a topic for discussion.  Second, Defendants assert that every witness deposed in this case, including the five deposed members of the six-member Committee, the Fire Chief, the Mayor, and a Captain, testified that Plaintiff's National Guard service, including his time commitment to the National Guard, was a positive attribute.  (Indeed it was in response to a question about positive

---

[4]Defendants also assert that they are entitled to summary judgment on the grounds of collateral estoppel.  However, this Court declines to apply the doctrine of collateral estoppel here, where questions remain regarding whether Plaintiff could have raised his federal claims before the NJDOP and its Merit System Board, and whether they possessed the authority to address them.  See Fioriglio v. City of Atlantic City, 963 F. Supp. 415, 424-25 (D.N.J. 1997) (finding that the NJDOP lacked the authority to address the plaintiff's federal claims and stating that "[t]he NJDOP and its Merit System Board may only interpret the application of New Jersey law to public bodies and entities").

[5]Plaintiff has moved for partial summary judgment as to the Municipal Defendants on his USERRA and LAD claims, on the grounds that Defendants cannot prove by a preponderance of the evidence that absent Plaintiff's military status, he would not have been hired.  Plaintiff's motion for partial summary judgment as to Alfano, is dependant upon the success of his USERRA claim, and demands Alfano's removal from his position as a firefighter.

[6]See Background, supra pp. 2-3.

factors in his background for the Committee's consideration that the National Guard first arose.) Third, Defendants assert that while several individuals testified that they believed the Committee may have been trying to gauge scheduling issues, not one member of the Committee testified that they considered this factor in ranking Plaintiff among the other candidates.  Finally, Defendants assert that Plaintiff's Emergency Medical Technician ("EMT") experience and Alfano's lack of EMT experience was not a material difference between the two candidates.

Plaintiff argues that the questions asked during his interview demonstrate that the Committee was improperly trying to determine how much of an effect Plaintiff's military service would have on the schedule of the Fire Department.  He further argues that these improper questions,[7] and the subsequent inconsistent excuses offered by the Committee for asking the questions, are clear evidence that his military status was a substantial or motivating factor in his exclusion from the Fire Department.  Plaintiff also asserts that this line of questioning is identical to inappropriate questioning put to a woman about her family plans.

Plaintiff asserts that Defendants have not offered a bona fide explanation for discussing his military obligations and future intentions, but rather, have given excuses that they were curious or that the questions were asked for scheduling purposes.  In addition, Plaintiff asserts that some members of the Committee have admitted that the questions were improper and that scheduling was not an issue at the interview stage.[8]  He also contends that as he was third on the

---

[7]At oral argument, Plaintiff conceded that he did not consider all of the questions asked regarding his military service improper, but specifically those questions pertaining to scheduling and his future plans.

[8]Defendants argue that although Plaintiff makes much of the fact that several witnesses had differing opinions during their depositions regarding whether Plaintiff's military service should have been discussed, these "after-the-fact" impressions do not constitute evidence of discriminatory intent.  (Defs.' Reply Br. 6 n.3.)  Defendants further argue that at most, the

NJDOP Certification prior to his interview, once the top two candidates were hired, he should have been the next individual selected from the Certification.

Defendants argue that contrary to Plaintiff's assertions, the Committee's depositions reveal that their statements regarding why Plaintiff was not selected are consistent.  In this regard, Defendants contend that all deposed members of the Committee testified that they did not rank Plaintiff as high as Alfano for six main reasons:

(1)     Plaintiff seemed to take the interview too casually (SOF ¶¶ 62, 76, 80);

(2)     he was inappropriately dressed (SOF ¶¶ 55, 67, 72, 76);

(3)     he used inappropriate words during the interview, including the term "gook" (SOF ¶¶ 56, 62, 76, 77);

(4)     he did not appreciate the significance of his criminal history, including an incident with a BB gun and a disorderly persons offense related to an incident with his girlfriend (SOF ¶¶ 56, 62, 67, 72, 80);

(5)     he had a terrible driving record for which he did not accept responsibility (SOF ¶¶ 62, 67, 72, 78); and

(6)     he seemed immature.[9]  (SOF ¶¶ 56, 72, 76.)

Defendants contend that even assuming, _arguendo_, that there is sufficient evidence upon which a trier of fact could find that Plaintiff's military service was a substantial or motivating

---

depositions establish that the Committee was merely curious and attempting to assess the level of accommodation that would be necessary in the event that it recommended Plaintiff's hiring.  (Id.) Defendants contend that these were wholly legitimate inquiries and do not establish an inference of discrimination, particularly where Plaintiff himself first raised the subject of his military experience and obligations.  (Id.)

[9]In addition, Defendants contend that Plaintiff's psychological evaluation confirmed the Committee's sense that Plaintiff was somewhat immature.  (Defs.' Br. 13; SOF ¶¶ 50-52.)

factor in his failure to be selected for the firefighter position, they would still prevail because they have demonstrated that they would have ranked Plaintiff in the same manner even without consideration of his military service.  Defendants assert that the five deposed members of the hiring Committee testified that they ranked Plaintiff lower than other candidates because of his interview, for the specific reasons listed above.  (SOF ¶¶ 55-57, 62, 67, 74, 76, 80.)  Defendants argue that each of these reasons, standing alone, is cause for a reasonable employer to rank a candidate lower than another candidate with whom it had direct prior positive employment experiences, such as in this case.

Plaintiff relies heavily on the discussion that took place at his interview in attempting to create a genuine issue as to a material fact as to whether his military service was a substantial or motivating factor in the Defendants' decision.  At the outset, it is important to note the context in which the discussion arose.  Plaintiff was asked an open ended question regarding the skills and background he might have that would contribute to the work of a firefighter, and he responded that in addition to having landscaping experience, he was a member of the National Guard.[10] Plaintiff argues that all questions related to scheduling or Plaintiff's future plans were inappropriate.  Setting aside the issue of propriety, the questions to which Plaintiff objects are merely logistical questions that are not discriminatory on their face.  Furthermore, these questions only made up a fractional portion of Plaintiff's entire interview.

The additional evidence proffered by Plaintiff (i.e., the Committee's deposed members' reflections on whether the questions were appropriate and why they were asked, Plaintiff's position on the NJDOP Certification, and his opinion that he was a better candidate) provides

---

[10]See Background, supra pp. 2-3.

little help in creating a genuine issue as to a material fact.  As Defendants have argued, whether

some members of the Committee in retrospect think that some of the questions were

inappropriate, does not definitively lead to an inference of discrimination.  Even if some

members of the Committee now think that some of the questions were inappropriate, this does

not imply that Plaintiff's military service was a motivating factor in the Committee's ranking

decisions.

In fact, all five of the deposed members of the six-member Committee, and the Mayor

testified that Plaintiff's National Guard service, including his time commitment to the National

Guard, was a positive attribute.  (SOF ¶¶ 54, 60, 68, 77, 81, 103.)  Behnke testified that "[w]e

liked the fact that he was in the military, show [sic] some degree of training and he would be

familiar with the chain of command, who is in charge, what's expected, very positive."  (SOF ¶

54; Hatfield Aff. ¶ 26, Ex. 25 at 132.)  Similarly, Kreszl testified that he "was looking at

[Plaintiff's] commitment to the Guard.  I viewed that as a positive.  Anybody that was willing to

commit for a long period of time I viewed as a positive . . . because he was into the discipline and

he was into the commitment to something he believed in."  (SOF ¶ 68; Hatfield Aff. ¶ 28, Ex. 27

at 33.)  Moreover, several Committee members testified that Plaintiff's military obligations were

not discussed by the Committee following Plaintiff's interview.  (SOF ¶¶ 61, 64, 77, 86.)

Regarding Plaintiff's position on the NJDOP Certification, and his opinion that he was a

better candidate in part because of his higher position, the Committee utilized the Certification in

order to determine which individuals were eligible for a firefighter position based on their written

and physical exams, not as a determination of who was a better candidate.  Plaintiff's position on

the Certification did not insure that he would be hired next, or hired before or instead of Alfano

(even though Alfano's position on the NJDOP Certification was lower), as the Committee had its own criteria and method for evaluating and ranking each candidate.  In addition, four of the five deposed Committee members testified that although Plaintiff's EMT experience was a positive attribute, Plaintiff's EMT experience, and Alfano's lack of EMT experience, did not amount to a material difference between the two candidates, as all new firefighters receive the same training. (Hatfield Aff. ¶ 26, Ex. 25 at 132-33; Hatfield Aff. ¶ 27, Ex. 26 at 86-87; Hatfield Aff. ¶ 29, Ex. 28 at 16-17; Hatfield Aff. ¶ 30, Ex. 29 at 111-12.)

An instructive case on USERRA claims is Gillie-Harp v. Cardinal Health, Inc., 249 F. Supp. 2d 1113, 1120 (W.D. Wis. 2003), where the court held that a reasonable jury could find that plaintiff's military status was a motivating factor in defendant's decision to terminate her where it was undisputed that customers had complained about plaintiff's absences to her immediate supervisor, the supervisor asked her if she could get out of her military leave, expressed frustration and questioned her regarding her military leave on several occasions, asked her to move her obligation to a different time or use vacation days to take leave, wrote several e-mails to plaintiff and others expressing concern over the amount of time plaintiff was out of the office because of military leave, was overheard by a co-worker making sarcastic remarks about plaintiff's reserve duties, and was monitoring her e-mail when plaintiff discussed that she might be called for active duty.  In addition to these undisputed facts, the court found a genuine dispute regarding whether the supervisor had told plaintiff she could not take military leave because "things fall apart when you're gone," asked her why she did not get out of the military, yelled at her whenever she asked for time off for reserve duty, and told her after the events of September 11, 2001, "I suppose you're going to try and tell me you have to go somewhere for a longer

18

period of time now."  Id. at 1120-21.

Here, the evidence adduced by Plaintiff falls far short of that proffered by the plaintiff in

Gillie-Harp.  Plaintiff's scant evidence consists of the questions asked at his interview regarding

his military service, the after-the-fact impressions of some Committee members regarding those

questions, his position on the NJDOP Certification, and his opinion that he was a better

candidate because of his position on the Certification and his EMT experience.  Unlike the

plaintiff in Gillie-Harp, Plaintiff Hart has not "adduced sufficient evidence from which a

reasonable jury could find that [his] military [service] was a" substantial or motivating factor in

the Defendants' decision.  Id. at 1119.  As a consequence of finding that no genuine issue as to a

material fact exists, Defendants' motion for summary judgment must be granted.

Even assuming, arguendo, that Plaintiff had established that a genuine issue exists

regarding whether his military service was a substantial or motivating factor in the Defendants'

decision, Defendants would still prevail as they have adduced sufficient evidence from which no

reasonable jury could find that Defendants' reasons for ranking Plaintiff lower than Alfano,

regardless of his military service, were invalid.  Of the six reasons that Defendants present

regarding why Plaintiff was ranked lower than other candidates, this Court will focus on the

following: (1) he used inappropriate language during the interview; (2) he seemed immature; (3)

he had a terrible driving record; and (4) he did not appreciate the significance of his criminal

history.

Of the five deposed members of the Committee, three members: Behnke, Naples, and

Ferrigno, testified that they heard Plaintiff use the racial slur "gook" during his interview.[11]  (SOF

_____

[11]Plaintiff argues that there is no evidence that he used a racial slur because it is not
reflected in the transcript of the interview.  Although Plaintiff's assertion is correct, three

¶¶ 56, 62, 76, 77.)  Behnke testified that Plaintiff used the term in reference to an accident he was

involved in with an "Oriental" driver and that Plaintiff said, "[o]h, you know how those gooks

drive."  (SOF ¶ 56; Hatfield Aff. ¶ 26, Ex. 25 at 112.)  Similarly, Ferrigno testified that Plaintiff

said, "[y]ou know how those gooks are," when discussing an "Oriental" man during the

interview.  (SOF ¶ 76; Hatfield Aff. ¶ 29, Ex. 28 at 29.)  Ferrigno also testified that Plaintiff used

a "curse here and there" during the interview (SOF ¶ 77; Hatfield Aff. ¶ 29, Ex. 28 at 43) as

evidenced by the transcript, where in response to a question concerning his work as a bouncer at

the Bar "Anticipation," Plaintiff used the word "hell."[12]  (SOF ¶ 45; Hatfield Aff. ¶ 8, Ex. 7 at

33.)

      At oral argument, Defendants also pointed to this particular answer as evidence of

Plaintiff's immaturity.  Not only does he respond to the Committee's question regarding a fight

he was involved in while working at the Bar "Anticipation" in a cavalier manner, as

demonstrated by his use of the word "hell," in the very same response, he states "[i]t's nice," and

invites the Committee members to "come down and meet the women" at the bar.  (Id.)  Standing

alone, these reasons could provide sufficient support for the Committee's decision to rank

Plaintiff lower than the other candidates.

      Yet, there were additional reasons why some members of the Committee perceived

Plaintiff as immature.  Ferrigno testified that in general Plaintiff did not seem to take the

questions seriously and seemed immature because of the manner in which he discussed his

---

members of the Committee testified that they heard the slur used, and the transcript is incomplete
as parts of the interview are labeled inaudible.  (See Hatfield Aff. ¶ 8, Ex. 7)  Furthermore, the
audiotape of the interview is not a part of the record before this Court.

    [12]See supra p. 4.

criminal history.  (SOF ¶ 76; Hatfield Aff. ¶ 29, Ex. 28 at 57.)  He explained that Plaintiff was

not ranked as high as other candidates in part because "[h]e had a lot of issues there and claimed

no responsibility for any of them."  (SOF ¶78; Hatfield Aff. ¶ 29, Ex. 28 at 64.)  Behnke testified

that Plaintiff had an immature attitude based in large part on the manner in which Plaintiff

discussed his relationship with his ex-girlfriend.  (SOF ¶ 56; Hatfield Aff. ¶ 26, Ex. 25 at 124.)

Kreszl testified that Plaintiff's demeanor seemed arrogant when describing interactions with the

police, and that in response to certain questions he implied that it was always somebody else's

fault.[13]  (SOF ¶ 72; Hatfield Aff. ¶ 28, Ex. 27 at 25-26.)  Furthermore, Plaintiff's psychological

---

[13]Kreszl also described a personal incident he had with Plaintiff when Plaintiff was on the
ambulance squad several years before.  Kreszl described this incident as follows:

> They [the ambulance] had gone over the North Broad Street bridge in the opposite
> direction [of the call].  We pulled the engine and the ambulance over.  My EMTs
> went inside and gave assistance to the person that was having difficulty breathing.
> There was a language barrier.  They were more Spanish speaking.  When the
> ambulance finally came back, Mr. Hart got out and accused us of trying to steal
> his medical call.  He was very arrogant.  I was a deputy chief on scene just
> watching my men doing what they do.  He was very abrasive.  It was
> embarrassing.  He accused us of trying to steal the call, we shouldn't have been
> there and all we were doing is helping the – we didn't even take the call.  They
> took the call.  We just registered the assistance that was required at that medical
> incident.  The way he came across with disrespect and everything, it burned in my
> – I couldn't believe anybody would do that especially in light of having a person
> there with having [sic] medical difficulties and that's an incident that stuck in my
> mind.
>          That's why I was interested in his, when he brought up his military
> service, I wanted to see whether maturity and the discipline that comes from that
> had impacted Mr. Hart, whether there was a change in – that's where the answers
> to some of those questions indicated that there were still a bit of growing up and
> maturity needed and that that impacted on my opinion.

(SOF ¶ 72; Hatfield Aff. ¶ 28, Ex. 27 at 72-73.)  Kreszl discussed this incident with the
Committee.  (Certification of Vincent F. Reilly ("Reily Cert."), at ¶ 10, Ex. I at 73-74.)  In
sum, regarding his ranking of Plaintiff, Kreszl testified that:

> Up until the interview I, you know, the couple of times that I've seen him in

evaluation found that "[h]e presents as a somewhat immature individual," and noted that "[a]s a

result of his immaturity and lack of focus he had multiple course failures" in college.  (SOF ¶ 52;

Hatfield Aff. ¶ 25, Ex. 24 at 2, 4.)      Members of the Committee also expressed concern

regarding Plaintiff's terrible driving record.  (SOF ¶¶ 62, 67, 72.)  At his interview, he discussed

receiving tickets for careless driving, failing to obey a directional sign, and for speeding.  (SOF ¶

43; Hatfield Aff. ¶ 8, Ex. 7 at 22-24.)  He also admitted that between May 2000, and December

2001, a little over a year and a half time period, he was involved in four motor vehicle accidents,

all of which he described as a "hundred percent" not his fault.  (SOF ¶ 43; Hatfield Aff. ¶ 8, Ex.

7 at 25-28.)

        Plaintiff's attitude towards his criminal history, in particular, his disorderly persons

offense, also stood out to members of the Committee as another reason he was ranked lower than

the other candidates.  (SOF ¶¶ 62, 67, 72, 80.)  Regarding an incident involving Plaintiff's former

girlfriend, which resulted in the disorderly persons offense, Kreszl explained that the way

Plaintiff described the incident and his interactions with the police, gave him a negative feeling

about the way Plaintiff had acted.  (Hatfield Aff. ¶ 28, Ex. 27 at 25-26.)  Delane testified that

Plaintiff had a casual, lackadaisical attitude during the interview, even when discussing serious

legal issues and confrontational situations involving the police, such as his disorderly persons

offense.  (SOF ¶ 80; Hatfield Aff. ¶ 30, Ex. 29 at 33, 127-129.)  Plaintiff also acknowledged at

---

greeting, he's, you know, seemed very pleasant and very nice and presented
himself well.  It was just some of the things that I walked away from the interview
with, said that there was still some of what I had experienced in earlier years, just
made me rate him less desirable than some of the other people.

(SOF ¶ 74; Hatfield Aff. ¶ 28, Ex. 27 at 90.)

his interview that he was rejected for employment with the Union County Department of Corrections for failing to identify this same disorderly persons offense on his employment application.  (SOF ¶ 42; Hatfield Aff. ¶ 8, Ex. 7 at 14-15.)

Taken together, these reasons strongly support the Committee's rankings.  Plaintiff has failed to set forth specific facts creating a genuine issue for trial regarding Defendants' reasons for hiring Alfano over Plaintiff.  See Sound Ship Bldg. Co., 533 F.2d at 99.  Plaintiff argues that his higher position on the NJDOP Certification and his EMT experience made him a better or more qualified candidate than Alfano.  However, as previously discussed, these factors did not create a material difference between the two candidates, and are insufficient to create a genuine issue for trial regarding Defendants' reasons for hiring Alfano over Plaintiff.[14]

In comparing the candidates, the Committee simply found that Alfano was the better candidate for the position.  (Hatfield Aff. ¶ 27, Ex. 26 at 87; Hatfield Aff. ¶ 29, Ex. 28 at 27; Hatfield Aff. ¶ 30, Ex. 29 at 109.)  The Committee also thought that Alfano was a better candidate than Jeffrey Barron, who was also ranked higher than Plaintiff on the Committee's recommendation to Caswell.[15]  Naples testified that the Committee was looking for a candidate who had a clean criminal record, good driving record, and who interviewed well.  (Hatfield Aff. ¶ 27, Ex. 26 at 85.)  Three members of the Committee specifically testified they did not recall anything negative about Alfano's interview.  (Hatfield Aff. ¶ 26, Ex. 25 at 137; Hatfield Aff. ¶ 28, Ex. 27 at 83; Hatfield Aff. ¶ 30, Ex. 29 at 105-06.)  In sum, everything Alfano brought to the interview process was positive: he interviewed well, had no criminal history problems, and was

---

[14]See supra pp. 17-18.

[15]See Background, supra pp. 6-7.  Incidentally, Jeffrey Barron's standing on the NJDOP Certification was also higher than Alfano's.  (See Hatfield Aff. ¶ 15, Ex. 14.)

overall a very good candidate.  (Hatfield Aff. ¶ 29, Ex. 28 at 62; Hatfield Aff. ¶ 30, Ex. 29 at 105, 109.)

Defendants have pointed to substantial evidence in the record that demonstrates that no genuine issue as to a material fact exists as to whether Defendants would have hired Alfano over Plaintiff, regardless of his military service.  Accordingly, this Court finds that Defendants have adduced sufficient evidence from which no reasonable jury could find that Defendants' reasons for hiring Alfano over Plaintiff, regardless of his military service, were invalid.  This finding is fatal to Plaintiff's claim.[16]

## B.   Plaintiff's LAD Claim

_____For the purposes of this motion, this Court will assume that Plaintiff has established a prima facie case of discrimination under LAD.  Under McDonnell Douglas, establishment of a prima facie case gives rise to a rebuttable presumption that Defendants unlawfully discriminated against Plaintiff.  411 U.S. at 802.  In order to rebut the presumption, Defendants must present admissible evidence of a legitimate, non-discriminatory reason for its employment decision.  McDonnell Douglas, 411 U.S. at 802; see also Burdine, 450 U.S. at 254.

Here, Defendants have presented evidence of numerous legitimate non-discriminatory reasons, other than Plaintiff's military service, for the Committee's decision to rank Plaintiff lower than Alfano.  As previously discussed, the primary legitimate non-discriminatory reasons which led to Plaintiff's lower ranking include the following: (1) he used inappropriate language

---

[16]In the absence of a sustainable claim under USERRA, Plaintiff's motion for partial summary judgment as to Alfano must be denied.  This motion was dependant upon Plaintiff's USERRA claim against the Municipal Defendants, and cannot be maintained on independent grounds.  Furthermore, this Court queries whether Plaintiff had standing to bring his motion in the first place.  In any event, Plaintiff's motion for partial summary judgment as to Alfano is denied as moot.

during the interview; (2) he seemed immature; (3) he had a terrible driving record; and (4) he did not appreciate the significance of his criminal history.  These reasons have been considered at length in this Court's discussion of Plaintiff's USERRA claim, thus they need not be re-examined here.[17]

Furthermore, Plaintiff has pointed to insufficient evidence from which a reasonable jury could infer that the legitimate non-discriminatory reasons articulated by Defendants were not their true reasons but were a pretext for discrimination.  Andersen, 89 N.J. at 493 (citation omitted).  Plaintiff argues that there is no evidence that he used foul language or a racial slur during his interview.  He also argues that the deposed Committee members' differing opinions regarding the appropriateness of the questions asked about his military service, reveals true inconsistencies.

In order to avoid summary judgment, Plaintiff's evidence rebutting Defendants' proffered legitimate reasons must allow a factfinder to reasonably infer that each of the Defendants' "proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate [their decision] (that is, the proffered reason is a pretext)."  Fuentes, 32 F.3d 759, 764.  Neither of Plaintiff's arguments amounts to evidence of pretext.  Plaintiff has failed to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the Defendants' reasons that "a reasonable factfinder could rationally find them 'unworthy of credence.'"  Fuentes, 32 F.3d at 765 (citation omitted).  There is simply no basis in the evidence for a reasonable jury to disbelieve Defendants' proffered reasons.  Absent

---

[17]See supra pp. 19-23.

25

any evidence to the contrary, Defendants' motion for summary judgment must be granted.[18]

## CONCLUSION

For the reasons set forth above, this Court finds that Defendants have shown that "there is no genuine issue as to any material fact and that [they are] entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The Municipal Defendants' motion for summary judgment is granted.  Plaintiff's motions for partial summary judgment are denied.


Dated: March 16, 2006


                                        S/Joseph A. Greenaway, Jr.
                                        JOSEPH A. GREENAWAY, JR., U.S.D.J.

---

[18]In his Complaint, Plaintiff alleges that he is entitled to punitive damages under LAD.  In light of this Court's decision, a discussion of punitive damages is unnecessary.

26